William J. O'Brien (State Bar No. 99526)
wobrien@onellp.com
One LLP
400 Corporate Pointe #300
Culver City, CA 90230
Telephone: 310.866.5158
Facsimile:  949.258.5081

*Attorneys for Non-Party Objector*
*The County of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, | Case No. 2:23-mc-00130-MWF-PD [District of MN Case No.: 22-cv-0098] |
| Plaintiffs, | *Before the Honorable Patricia Donahue* |
| v. | **MEMORANDUM OF LOS ANGELES COUNTY IN OPPOSITION TO MOTION BY MICHAEL J. LINDELL AND MY PILLOW TO ENFORCE SUBPOENAS** |
| MICHAEL J. LINDELL and MY PILLOW, INC., | Hearing Date:  October 30, 2023 |
| Defendants. | Time:           1:30 p.m. |
| | Courtroom:    580 |

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................1

II.    STATEMENT OF FACTS ...........................................................................2

       A.    Michael Lindell and My Pillow ...............................................2

       B.    Los Angeles County's Voting System and Elections .............3

       C.    The Vital Need to Protect Election Security ..........................4

       D.    The Need to Protect Election Hardware, Software, and Confidential
             Documents ...............................................................................5

       E.    The Dangers and Burdens of Lindell and My Pillow's Document
             Demands ...................................................................................7

       F.    The Threat to Election Security from Lindell and Other Conspiracy
             Theorists ...................................................................................8

       G.    Lindell and My Pillow's Loss of Counsel and Lack of Any Reputable
             Expert ......................................................................................10

       H.    Independent Confirmation of the Security of Los Angeles County
             Elections .................................................................................11

       I.     Publicly Available Information About VSAP .......................13

III.   THE COURT SHOULD PROTECT NONPARTIES, LIKE THE COUNTY, FROM UNDULY
       INTRUSIVE AND BURDENSOME SUBPOENAS ........................................13

IV.    LINDELL AND MY PILLOW SHOULD NOT BE ALLOWED TO JEOPARDIZE
       ELECTION SECURITY ............................................................................15

V.     LINDELL AND MY PILLOW DO NOT GENUINELY NEED THE HARDWARE,
       SOFTWARE, AND DOCUMENTS THEY ARE SEEKING ...........................16

VI.    LINDELL AND MY PILLOW'S DOCUMENT DEMAND IS ABSURDLY
       OVERBROAD ...........................................................................................19

VII.   LINDELL AND MY PILLOW ARE NOT EQUIPPED TO USE—OR TO PROTECT—THE
       HARDWARE, SOFTWARE, AND DOCUMENTS THEY ARE SEEKING .......20

VIII.  THE PROTECTIVE ORDER DOES NOT PROVIDE ADEQUATE PROTECTION .........21

i

IX.     LINDELL AND MY PILLOW ARE NOT ENTITLED TO CLAIM ATTORNEYS' FEES..................................................................................21

X.     CONCLUSION..........................................................................22

**MEMORANDUM IN OPP. TO MOT. TO ENFORCE SUBPOENAS**

1

## TABLE OF AUTHORITIES

2
**Page(s)**

3
**Cases**

4
5
*Cascade Yams, Inc. v. Knitting Fever, Inc.*,
    755 F.3d 55 (1st Cir. 2014) ................................................................ 14

6
7
*Chevron Corp v. Donziger*,
    2013 U.S. Dist. LEXIS 119622 (N.D. Cal. Aug. 22, 2013) .............. 13

8
9
*Congoo LLC v. Revcontent*,
    No. 16-401 (MAS), 2017 U.S. Dist. LEXIS 130731 (D.N.J. Aug.
    10, 2017) ............................................................................................ 21

10
11
*Cook Cty. Republican Party v. Pritzker*,
    487 F. Supp. 3d 705 (N.D. Ill. 2020) ................................................ 15

12
13
*In re Denture Cream Prods. Liab. Litig.*,
    292 F.R.D. 120 (D.D.C. 2013) ........................................................... 22

14
15
*Dominion Voting Systems, Inc. v. Lindell*,
    No. 21-445 (D.D.C.) ............................................................................. 3

16
17
*Hosseinzadeh v. Bellevue Park Homeowners Ass'n*,
    No. C18, 2020 U.S. Dist. LEXIS 106222 (W.D. Wash. June 17,
    2020) ............................................................................................ 19, 20

18
19
*Mattel Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) .............................................................. 14

20
21
*Moon v. SCP Pool Corp.*,
    232 F.R.D. 633 (C.D. Cal. 2005) ....................................................... 14

22
23
24
*National Staffing Sols, Inc. v. Sanchez*,
    No. 6:21-cv-1590-PGB-LHO, 2022 U.S. Dist. LEXIS 240895 (M.D.
    Fla. Sept. 12, 2022) ............................................................................ 20

24
25
*Nidec Corp. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007) .............. 14

26
27
*Penwalt Corp. v. Durand-Wayland, Inc.*,
    708 F.2d 492 (9th Cir. 1983) .............................................................. 21

28

iii

*Pinn v. Consumer Credit Counseling Found., Inc.*,
  MC 22-00240-DSF, 2023 U.S. Dist. LEXIS 115365 (C.D. Cal. Jan.
  19, 2023) ................................................................................................... 19

*In re Plise*,
  506 B.R. 870 (B.A.P. 9th Cir. 2014) ...................................................... 22

*Poturich v. Allstate Ins. Co.*,
  No. EDCV 15-0081-GW, 2015 U.S. Dist. LEXIS 187149 (C.D. Cal.
  Aug. 11, 2015) ....................................................................................... 22

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ................................................................................... 15

*Simplex Mfg. Co. v. Chien*,
  No. C12-0835-RAJ, 2012 U.S. Dist. LEXIS 124625 (W.D. Wash.
  Aug. 31, 2012) ....................................................................................... 20

*Smartmatic v. Lindell*,
  No. 22-cv-0098 ....................................................................................... 16

*Soto v. Castlerock Framing & Transport, Inc.*,
  282 F.R.D. 492 (E.D. Cal. 2012) ........................................................... 14

*Struck v. Yida*
  GAO, No. 2:22-cv-02415-SPG-MAA, 2023 U.S. Dist. LEXIS
  111857 (C.D. Cal. Mar 15, 2023) .......................................................... 19

*Viacom Int'l Inc. v. YouTube Inc.*,
  253 F.R.D. 256 (S.D.N.Y. 2008) ........................................................... 21

*Vysata v. Menowitz*,
  2019 U.S. Dist. LEXIS 125356 (C.D. Cal. May 30, 2019) ..................... 13

**Statutes**

California Elections Code § 19100 ..................................................................5

California Elections Code § 19200 ..................................................................5

**Other Authorities**

FED. R. CIV. P. 26(b)(1) ................................................................................ 15

FED. R. CIV. P. 26(b)(2) ................................................................................ 14

iv

FED. R. CIV. P. 45 ...................................................................................... 19, 21, 22

FED. R. CIV. P. 45(d)(1) .................................................................................. 14, 19

FED. R. CIV. P. 45(d)(2)(B) .................................................................................. 15

FED. R. CIV. P. 45(d)(2)(B)(ii) ............................................................................. 15

FED. R. CIV. P. 45(d)(3)(A) .................................................................................. 15

FED. R. CIV. P. 45(e)(1)(D) .................................................................................. 14

**MEMORANDUM IN OPP. TO MOT. TO ENFORCE SUBPOENAS**

## I.    INTRODUCTION

The Court should reject Lindell and My Pillow's unfounded attempt to compromise the security of Los Angeles County's one-of-a-kind election system, as well as their attempt to force the County to turn over hundreds of thousands of documents, including highly sensitive election security information.  For the County to comply with Lindell and My Pillow's subpoena would violate security restrictions imposed by the California Secretary of State and jeopardize the County's ability to lawfully conduct elections, threatening the voting rights of some 5.8 million registered voters.  The Secretary of State has already successfully blocked Lindell and My Pillow from obtaining similar source code and documents from one of its contractors in Texas; and a motion in Minnesota by Lindell and My Pillow to obtain the documents has been opposed by the Plaintiff, Smartmatic, and is pending.  Compelling the County, a third party, to provide them would be massively burdensome—if even possible—and the resulting breach of security could have severe consequences.

This motion is baseless, because Los Angeles County's voting system has no logical relationship to Lindell and My Pillow's claim that the 2020 election was stolen from Donald Trump—which is the claim that resulted in Smartmatic's suit for defamation.  They should not be allowed to divert attention from their lack of evidence for that claim by conducting a fishing expedition into unrelated voting technology that was developed and owned by Los Angeles County and has been used only here, where Trump had no chance of winning and where even a miraculous victory would still not have yielded him any electoral college votes.

Further, the requested production would be pointless because Lindell and My Pillow have run out of funds, and their counsel are withdrawing from Smartmatic's defamation case.  By their own admission, they have no resources to review the massive number of documents they have indiscriminately demanded from the County.  They have no expert to review the voting machines and source code they

1

1  are demanding—and they cannot be trusted to safeguard any devices, code, or

2  documents to which they are given access.  In fact, Lindell has already been

3  implicated in the inappropriate public disclosure of election software, and he was

4  served with a search warrant as part of a criminal investigation by the FBI.

5       A compromise of subpoenaed voting equipment because of a subpoena from

6  election conspiracy theorists in Arizona resulted in millions of dollars of expenses

7  when a county's equipment had to be destroyed and replaced.  A similar

8  compromise of Los Angeles County's voting system would have dramatically more

9  disastrous consequences.  In fact—according to the California Secretary of State—it

10  would call into question the County's ability to conduct the 2024 election.  The

11  Court should not allow itself to be made a party to such a dangerous and unfounded

12  abuse of discovery.

13  **II.   STATEMENT OF FACTS**

14       **A.   Michael Lindell and My Pillow**

15       Defendant Michael J. Lindell is a television pillow vendor and election

16  conspiracy theory promoter who for years has been attracting media attention by

17  aggressively asserting claims that the 2020 election was stolen from Donald Trump.

18  Time after time, Lindell's promises to prove such fraud have fallen flat.  For

19  example, he "vowed again and again that he would file an election fraud complaint

20  directly to the U.S. Supreme Court that would somehow reinstate Donald Trump as

21  president."  (Yahoo! News, "Mike Lindell Finally Reveals His Supreme Court

22  Complaint, And Critics Have Notes" (Nov. 24, 2021), *available at:*

23  https://news.yahoo.com/mike-lindell-finally-reveals-supreme-025852008.html.)

24  "'We will have this before the Supreme Court before Thanksgiving,' he promised in

25  September [2021].  'That's my promise to the people of this country.'"  (*Id.*)  He

26  even claimed he had "tons" of state attorneys general ready to sign on to a supreme-

27  court complaint to be filed at 9 a.m. on November 23, 2021, "[b]ut as 9 a.m. came

28

1   and went . . ., no lawsuit had been filed, and Lindell offered a fresh batch of

2   conspiracy theories to explain away his broken promise."  (*Id.*)

3       As another example, in August 2021, Lindell hosted a "cyber symposium"

4   where he presented what he claimed was genuine 2020 election data supporting his

5   conspiracy theories and offered $5 million to anyone who could show it was not

6   valid.  One of the attendees did just that, but Lindell refused to pay.  Arbitrators

7   entered a $5 million award against him.  (*See, e.g.,* NBC News, "Mike Lindell

8   ordered to pay $5M for losing 'Prove Mike Wrong' election data challenge" (Apr.

9   20, 2023), *available at:* https://www.nbcnews.com/politics/2020-election/mike-

10   lindell-ordered-pay-5m-losing-election-data-challenge-rcna80644.)

11       Lindell's election conspiracy accusations have gotten him and My Pillow

12   sued repeatedly for defamation, including by Dominion Voting Systems (*see*

13   *Dominion Voting Systems, Inc. v. Lindell*, No. 21-445 (D.D.C.)) and by Smartmatic

14   USA Corp. and related companies, the plaintiffs in this case.

15       **B.**    **Los Angeles County's Voting System and Elections**

16       The Registrar-Recorder/County Clerk of the County of Los Angeles operates

17   one of the most extensive and complex voting operations in the United States,

18   serving a diverse population larger than that of most states.  The County of Los

19   Angeles includes almost ten million people, 88 cities, and numerous other

20   governmental entities whose functioning depends on the County's ability to conduct

21   secure and lawful elections.  (Owens Decl. ¶ 2.)

22       The County's Registrar-Recorder/County Clerk directed development of a

23   unique voting system called "Voting Solutions for All People" (VSAP) to provide

24   the County with secure elections, verified results, and universal voter access.  The

25   VSAP system includes ballot marking devices (BMDs) that voters can use to mark

26   paper ballots, creating a clear audit trail.  (*Id.* ¶ 3.)

27       Smartmatic was not involved in the original planning and design for the

28   VSAP system. The County separately contracted for and controlled the initial design

and development of the VSAP BMDs and their software.  The County owns copyrights to the software and restricts access to it for security, certification, and licensing reasons.  (*Id.* ¶ 4.)

After the basic design of the VSAP system and BMDs had been developed, the County issued a request for proposal seeking bids to manufacture the BMDs on a contract basis and provide other services and support for the VSAP program.  The County contracted with Smartmatic USA Corp., one of the plaintiffs in this case, for services including the manufacturing and production of BMDs and certain other equipment.  (*Id.* ¶ 5 & Ex. A.)

Under its contract with Smartmatic, the County retains full ownership of VSAP BMDs and full intellectual property rights to VSAP software developed by Smartmatic, as well as ownership of all documents related to the project. Smartmatic and the County agreed that "anything developed, designed and/or provided by [Smartmatic] in the course of providing the Services, including but not limited to, the VSAP Solution, and all works based thereon, incorporated therein, or derived therefrom, shall be the sole property of [the] County."  (Owens Decl. ¶ 6 & Ex. A at § 2.1.1; *see also id.*, Ex. A at § 2.3.1 (The VSAP Solution, including "any aspects, parts, or components of it . . . is owned exclusively by [the] County.").) The contract provides that the County is "***the sole owner*** of all right, title and interest, including copyright, in and to all software, plans, diagrams, facilities, documentation, and tools, which are originated or created through [Smartmatic]'s and its Subcontractor's work pursuant to this Contract."  (*Id.*, Ex. A at § 2.3.1 (emphasis added).)

## C.    The Vital Need to Protect Election Security

Election security is a matter of grave concern.  Unfounded accusations of election fraud—including accusations directed against voting equipment and voting systems—have been widely made believed.  These accusations have called into question public confidence in the security of elections.  Election agencies in

4

1  multiple states have had their work disrupted, have been forced to incur large

2  litigation expenses, and have even had their employees threatened with

3  violence.  (*See* Owens Decl. ¶ 7; *see also id.* ¶¶ 13–16.)

4         As is detailed further below, the County attempts to thoroughly protect the

5  security of its election processes and equipment by using a system of multi-layered

6  security protocols, including maintaining the security of physical devices and

7  software.  (*See id.* ¶ 8; Bhullar Decl. ¶¶ 15–23; *infra* part H.)   The County is also

8  required to comply with multiple requirements of federal and state laws and

9  regulations.  In particular, the County cannot conduct elections without the approval

10 of the California Secretary of State, who is the chief elections official of the State of

11 California and is responsible for certifying voting systems for use in California.  *See*

12 CAL. ELEC. CODE §§ 19100, 19200.

13        **D.      The Need to Protect Election Hardware, Software, and**

14                **Confidential Documents**

15        In order to lawfully use the VSAP hardware and software for elections, the

16 County is required to comply with the conditions set forth in the Secretary of State's

17 conditional approvals.  (*See* Owens Decl. ¶¶ 9, 11.)  These approvals prohibit the

18 County to turn over BMDs with VSAP software to unauthorized third parties, as

19 Lindell and My Pillow are attempting to compel the County to do in this motion.  To

20 the contrary, the Secretary of State mandates:

21              Prior to the disposal or sale of this voting system or portion

22        thereof, ***all equipment shall be cleared with a minimum of a two-pass***

23        ***wipe so that no software, firmware or data remains on the equipment***.

24        At the time of disposal or sale, the equipment shall be returned ***solely***

25        ***to a non-functioning piece of hardware*** . . . .

26 (*Id.* ¶ 11 & Exs. A, C (emphasis added).)  The Conditional Approvals also provide

27 that the VSAP system "is for the exclusive use of Los Angeles County at this time."

28 (*Id.*)

The staff of the California Secretary of State have expressed serious concerns about giving possession of VSAP BMD, software, or confidential security documents to third parties such as Michael Lindell and My Pillow, and the Secretary of State has successfully moved to block Lindell and My Pillow from obtaining similar source code and documents and one of the Secretary's contractors.  (*See id.* ¶¶ 13–15, 17 & Exs. E–F.)  In that proceeding, the Secretary of State told the court that "disclosure of the source code and the Trusted Build of a voting system would essentially ***provide a malicious actor with the blueprints to the voting system*** to which they would not otherwise have access to."  (*Id.*, Ex. E, Mot. ¶ 12 at p. 6 (emphasis added).) The Secretary of State also strongly opposed Lindell and My Pillow's attempt to obtain documents similar to those that they are seeking here, because "***[d]isclosure of such documents and communications encompassing highly sensitive and confidential information, including security-related information, would pose a potential security risk to the California voting systems if publicly revealed***."  (*Id.*, Ex. E, Mot. ¶ 10 at pp. 5–6 (emphasis added).)  The Secretary of State warned, "The stakes of such unauthorized disclosure are extremely high," and "[t]he consequences of any security compromise for any voting system used in California could be far more disastrous than in [a previous breach involving disclosures to election conspiracy theorists in] Arizona."  (*Id.*, Ex. E, Mot. ¶¶ 17–18 at pp. 9–10.)

> [R]emediation after any breach or disclosure of these materials would ***threaten the ability of the largest election jurisdiction in the country from being able to safely and securely conduct a national election***. ... Remediation efforts for Los Angeles County through the implementation of an alternative voting system—for a county with over 5.6 million registered voters—would be a logistical and administrative impossibility with less than 8 months before California's March 2024 Presidential Primary Election. …  Also, under state law any changes to

6

the code and or hardware would require submission to the Secretary of State for certification. ... Under California Elections Code section 19216, modification of a certified voting system is prohibited without the prior approval of the Secretary. This only scratches the surface of the harm that could result from disclosure to defendants of materials in [the contractor]'s possession.

(*Id.*, Ex. E, Mot. ¶ 17 at pp. 9–10 (emphasis added) (citations omitted).)

### E.     The Dangers and Burdens of Lindell and My Pillow's Document Demands

Lindell and My Pillow's sweeping demand for all communications between the County and Smartmatic encompasses a huge number of communications, many of which contain highly sensitive technical and security information.  (*See, e.g.,* Bhullar Decl. ¶¶ 13–14; O'Brien Decl. ¶¶ 2–3.)  A few examples of such extremely sensitive documents, access to which is strictly limited, are as follows:

(a)   ***The VSAP End-to-End Security Plan:***  This is the overarching plan governing the County's election security measures and controls.  It is effectively a blueprint of what the County does to protect its elections systems.  This document also includes details of how and where election encryption keys are saved, and methods to decrypt those keys, as well as physical security.  Accessing any portion of this document could give an undue advantage to a threat actor seeking to circumvent the County's election security framework.  (Bhullar Decl. ¶ 14.)

(b)   ***Security Assessment by Cylance Consulting on BMD and BMG:***  This "Proprietary and Confidential" document is extremely sensitive because it outlines very low-level, specific configurations of Trusted Platform Module used for election systems, including encryption keys and mounting and accessing

7

the OS images (the programs and data files needed to make an operating system functional). Revealing this information would increase the risk for election system security. (*Id*.)

(c) ***Executive Summary for the Security Plan for Airgapped Networks:*** This document is extremely sensitive because it describes the specific products and versions that are part of the County's election security infrastructure. Revealing them would narrow the threat vector for a malicious actor trying to find vulnerabilities of these products and configurations. (*Id*.)

(d) ***Security Assessment by Mandiant on VSAP System:*** This "Proprietary and Confidential" document is extremely sensitive because it identifies and assesses different approaches that an attacker could take to circumvent the County's election security. It outlines code-level details, including the vectors that were tested as part of this assessment. Revealing these details to unauthorized persons would increase the risk to the system. (*Id*.)

In Smartmatic's New York case against Fox News, the court held that such sensitive documents need not be produced. (O'Brien Decl. ¶ 2.) Locating and segregating them took an enormous effort, which had to be spearheaded by Smartmatic's counsel using extensive electronic searching and a staff of document reviewers. (*Id.* ¶ 3; *see* Bhullar Decl. ¶ 13.)

## F. The Threat to Election Security from Lindell and Other Conspiracy Theorists

The irresponsible actions of Michael Lindell and other election conspiracy theorists have already caused considerable damage and threaten to cause more. For example, press reports indicate that, after an investigation of the 2020 election compromised the security of voting equipment in Maricopa County, Arizona, that county found it necessary to destroy and replace millions of dollars of such

8

equipment.  (*See, e.g.*, Lacey Latch and Mary Jo Pitzl, "Maricopa County will spend millions to replace voting machines turned over to the Arizona Senate for audit," Arizona Republic (July 14, 2021) (*available at:*

https://www.azcentral.com/story/news/politics/arizona/2021/07/14/arizona-audit-maricopa-county-spend-2-8-m-replace-voting-machines/7965882002) ("Maricopa County will spend nearly $3 million to replace voting equipment that officials say was permanently tainted by the Arizona Senate's election review.  The county will spend millions to purchase and then destroy the old equipment that was subpoenaed for the audit as well as for new systems before the upcoming elections.  . . . [T]he Board of Supervisors agreed to purchase all of the subpoenaed equipment from Dominion Voting Systems for disposal. …").)

Lindell has been personally involved in at least one instance of improperly disseminating election software.

> Copies of the Dominion Voting Systems software used to manage elections—from designing ballots to configuring voting machines and tallying results—were distributed at an event . . . in South Dakota organized by MyPillow CEO Mike Lindell….  The software copies came from voting equipment in Mesa County, Colorado, and Antrim County, Michigan, where Trump allies had sued unsuccessfully challenging the results from last fall….  While it's not clear how the copies came to be released at the event, they were posted online and made available for public download….  The release gives hackers a 'practice environment' to probe for vulnerabilities they could exploit and a road map to avoid defenses ….

(Christina A. Cassidy, "Experts warn of dangers from breach of voter system software," *AP News* (August 28, 2021), *available at:*
https://apnews.com/article/technology-software-election-2020-1341028212960b9b4ed713620d764629); *see also* Sarah D. Wire, "Far-right

9

presentation using misappropriated election software alarms experts," *Los Angeles Times* (March 30, 2023), *available at:* https://www.latimes.com/politics/story/2023-03-30/election-machines-cpac) ("Using copies of election software that was improperly taken from multiple counties and that has been circulating among election deniers, they presented unfounded claims that they had discovered evidence of fraud and foreign interference…. Merritt told The Times his portion of the presentation was based only on images taken of the Mesa County election system, ***which were disseminated at an August 2021 cybersymposium held by Trump ally and MyPillow Chief Executive Mike Lindell***, and can still be found online… ." (emphasis added).)

Lindell has also been investigated by the FBI for potential crimes related to accessing voting machine technology. The U.S. District Court in Minnesota issued a warrant for the search of his person and seizure of his personal cell phone in connection with unauthorized access of the Dominion voting system in Mesa County, Colorado. Magistrate Judge Leung found probable cause for federal agents to search Lindell's phone for information "relating to damage to any Dominion computerized voting system, including any impairment to, or attempt to impair, the integrity or availability of data, a program, a system, or information" as well as information related to "any attempted or successful misappropriation, theft, conversion, transfer, or exfiltration of any proprietary hardware, software, or other data." (O'Brien Decl. ¶ 4 & Ex. A.)

## G. Lindell and My Pillow's Loss of Counsel and Lack of Any Reputable Expert

Yesterday, Lindell and My Pillow's attorneys moved to withdraw from Smartmatic's defamation case, saying that their clients owe them millions of dollars and cannot pay. (*See* O'Brien Decl. ¶ 5 & Exs. B–D.) According to Lindell and My Pillow's lead lawyer, this has made it impossible for his team to perform outstanding tasks such as "numerous depositions noticed by both the Plaintiffs and

10

Defendants; document review of millions of documents, including the hosting of those documents on litigation management software; and the preparation and submission of rebuttal expert reports as well as additional expert discovery, such as depositions. …  These future fees and costs will amount to millions of dollars in addition to the millions of dollars already owed." (*Id.*, Ex. C at ¶¶ 19–20.).  Mr. Lindell appears to agree.  "'We've lost everything, every dime,' [Lindell] told NBC News in a phone interview.  'All of it is gone.'"  (NBC News, "MyPillow lawyers say CEO Mike Lindell owes them millions of dollars" (Oct. 5, 2023), *available at:* https://www.nbcnews.com/politics/politics-news/mypillow-lawyers-say-ceo-mike-lindell-owes-millions-dollars-rcna119058; *see also* Media Matters, "MyPillow CEO Mike Lindell says his lawyers in defamation lawsuits have dropped him after he stopped paying them" (Oct. 5, 2023) (Lindell says, "We—I—can't pay the lawyers. We can't pay.  There's no money left over to pay them."), *available at:* https://www.mediamatters.org/mike-lindell/mypillow-ceo-mike-lindell-says-his-lawyers-defamation-lawsuits-have-dropped-him-after

Expert reports in this case have not come due, and Lindell and My Pillow have not designated an expert witness to inspect any hardware or software or analyze technical documents.  (O'Brien Decl. at ¶ 6.)

### H.    Independent Confirmation of the Security of Los Angeles County Elections

The security of the November 2020 election in Los Angeles County and the other elections using the VSAP system is beyond reasonable question and is confirmed by reliable independent sources.  (*See, e.g.,* Bhullar Decl. ¶¶ 15–25.) All versions of VSAP used in elections have been examined and tested by accredited independent, third-party testing authorities engaged by the California Secretary of State and have then been certified by the Secretary of State in accordance with the California Elections Code.  (*Id.* ¶¶ 16, 19.)  The Secretary of State arranged for extensive testing of each VSAP version by an accredited

independent testing authority.  (*Id.* ¶ 18.)  The certification process has included examination of the application and technical documentation; development of a detailed system test plan that reflected the scope and complexity of the system; source code review for software components; a trusted build to conclusively establish the system version and components being tested; operation and functional testing of hardware and software components; security testing that included a full source code review and penetration testing; volume testing of the system and all devices with which the end user directly interacts; functional and performance testing of the integrated system, including testing of the full scope of system functionality; performance tests for telecommunications and security; examination and testing of the system operations and maintenance manual; and accessibility examination and testing.  (*Id.* ¶ 17.)

After testing was completed and the software source code finalized, the independent testing authority oversaw the creation of what is known as the "trusted build."  Upon completion of the trusted build, the independent testing authority created an immutable hash value that uniquely identifies the code built.  A hash is a mathematical function that creates a unique string of letters and numbers that identifies a system and its programming. Any modification will result in returning a different hash code.  This allows vendors and elections officials to compare hash values and confirm that the voting system and its source code have not been altered. (*Id.* ¶¶ 20–21.)

The independent testing authority provides the trusted build files to the County, which deposits them and the software source code into a state–approved escrow facility.  (*Id.* at 22.)  The County uses the hash code to confirm that the trusted build files are identical to those that were reviewed and tested by the independent testing authority before installing them in the voting system hardware for an election.  (*Id.*)

As yet a further security mechanism, the VSAP voting system incorporates an Enterprise Signing Authority (ESA) infrastructure, using encryption to ensure that each component of the VSAP system conforms to security standards and to help ensure that the data being passed to various components and modules is secure and authenticated.  This system uses encryption keys for an electronic handshake of various systems or modules.  If the encryption keys do not match, then the systems are rendered unusable and County staff is notified.  This allows the County to maintain strict integrity of hardware and software being used in every election.  (*Id.* at ¶ 23.)

## I.    Publicly Available Information About VSAP

Lindell and My Pillow have ready access to extensive publicly available information sufficient to describe the VSAP system and satisfy any legitimate questions about its features and operation.  These include, for example, videos showing operation of the system; a detailed, 45-page "Voting Solutions For All People Final Report"; and a detailed, 189-page report entitled, "Voting Solutions for All People Use Procedures," as well as certification documents, use procedures, and testing reports on the California Secretary of State's web site.  (*See* Bhullar Decl. ¶¶ 26–27 & Exs. A–C; Los Angeles County Registrar-Recorder/County Clerk, "How to use Ballot Marking Device in L.A. County, *available at:* https://www.youtube.com/watch?v=MUVdKxY8lUA&list=PLM7uksj50naEIAqWv CsdGIt5vmmupe2Ts&index=11; California Secretary of State, "Los Angeles County VSAP," *available at:* https://www.sos.ca.gov/elections/ovsta/voting-technology-vendors/los-angeles-county-vsap.)

## III.   THE COURT SHOULD PROTECT NONPARTIES, LIKE THE COUNTY, FROM UNDULY INTRUSIVE AND BURDENSOME SUBPOENAS.

The party issuing a subpoena must demonstrate that the discovery sought is relevant. *Vysata v. Menowitz*, 2019 U.S. Dist. LEXIS 125356, at *3-4 (C.D. Cal. May 30, 2019); *Chevron Corp v. Donziger*, 2013 U.S. Dist. LEXIS 119622, at *4

13

1  (N.D. Cal. Aug. 22, 2013).  But not all relevant information must be produced.  On

2  the contrary, "[a] party or attorney responsible for issuing and serving a subpoena

3  must take reasonable steps to avoid imposing undue burden or expense on a person

4  subject to the subpoena. The court for the district where compliance is required must

5  enforce this duty and impose an appropriate sanction—which may include lost

6  earnings and reasonable attorney's fees—on a party or attorney who fails to

7  comply." FED. R. CIV. P. 45(d)(1).

8     Discovery may be refused where the burden of the proposed discovery

9  outweighs its likely benefits, taking into account the needs of the case, the parties'

10 resources, the importance of the issues at stake, and the role of proposed discovery

11 in resolving those issues.  FED. R. CIV. P. 26(b)(2); *Cascade Yams, Inc. v. Knitting*

12 *Fever, Inc.*, 755 F.3d 55, 58–59 (1st Cir. 2014).  In evaluating whether a subpoena is

13 unduly burdensome, courts consider "such factors as relevance, the need of the party

14 for the documents, the breadth of the document request, the time period covered by

15 it, the particularity with which the documents are described[,] and the burden

16 imposed." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005).

17 Abusively drawn subpoenas may be quashed because they impose an undue burden.

18 *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813 (9th Cir. 2003)

19 (subpoena "way too broad" if drafted without any attempt made "to try to tailor the

20 information request to the immediate needs of the case.").  Relatedly, "[t]he person

21 responding need not provide discovery of electronically stored information from

22 sources that the person ***identifies as not reasonably accessible because of undue***

23 ***burden or cost***." FED. R. CIV. P. 45(e)(1)(D) (emphasis added).  Additionally, a

24 nonparty's obligation to produce documents may be excused if the documents can

25 be sought from a party or other sources without the need to seek them from a

26 nonparty by subpoena.  *Soto v. Castlerock Framing & Transport, Inc.*, 282 F.R.D.

27 492, 505 (E.D. Cal. 2012); *Nidec Corp. Victor Co. of Japan*, 249 F.R.D. 575, 577

28 (N.D. Cal. 2007).  Courts may also modify a subpoena that "requires disclosure of

14

trade secret or other confidential research, development, or commercial information[.]" FED. R. CIV. P. 45(d)(3)(A).

Instead of serving and filing a motion for a protective order or motion to quash, a nonparty may serve the subpoenaing attorney with "a written objection to inspecting, copying, testing[,] or sampling any or all of the materials." FED. R. CIV. P. 45(d)(2)(B).  Serving objections excuses compliance: "These acts may be required only as directed in the order…." FED. R. CIV. P. 45(d)(2)(B)(ii).

## IV.  LINDELL AND MY PILLOW SHOULD NOT BE ALLOWED TO JEOPARDIZE ELECTION SECURITY.

Discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).  Certainly, discovery should not unnecessarily jeopardize election security. Yet that would be the effect of granting Lindell and My Pillow's motion.

"Confidence in the integrity of our electoral processes is essential to the function of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *see also Cook Cty. Republican Party v. Pritzker*, 487 F. Supp. 3d 705, 710 (N.D. Ill. 2020) (describing the "critical importance of secure elections to a functioning democracy").  As explained above, accusations of election fraud have called into question public confidence in the security of elections.  Election agencies in multiple states have had their work disrupted, have been forced to incur large litigation expenses, and have even had their employees threatened with violence.  (*See supra* part II C.)  As further explained, the County is required to comply with multiple requirements of federal and state laws and regulations, including prohibitions on transferring voting machines with software installed to third parties.  (*See supra* part II D; Owens Decl. ¶ 9.)  Turning over voting machines

in response to a subpoena forced Maricopa County, Arizona, to destroy and replace millions of dollars of compromised equipment.  (*See supra* part II F.)  The consequences of any similar compromise in Los Angeles County would be much worse and, according to the Secretary of State, it would "***threaten the ability of the largest election jurisdiction in the country from being able to safely and securely conduct a national election***. ...  Remediation efforts . . . would be a logistical and administrative impossibility with less than 8 months before California's March 2024 Presidential Primary Election. …"  (Owens Decl., Ex. E, Mot. ¶ 17 at pp. 9–10 (emphasis added); *supra* part II D.)

Similarly, disclosure of details of the County's multi-layered security protocols—as in documents demanded by Lindell and My Pillow—could create vulnerabilities and assist attackers trying to circumvent the County's protections. (*See, e.g.*, Bhullar Decl. ¶¶ 9–10; *supra* part II E.)

## V.    LINDELL AND MY PILLOW DO NOT GENUINELY NEED THE HARDWARE, SOFTWARE, AND DOCUMENTS THEY ARE SEEKING.

The hardware, source code, and hundreds of thousands of VSAP documents that Lindell and My Pillow are requesting are not even relevant to this case.  The thrust of the false claims for which they are being sued was that Smartmatic assisted in stealing the 2020 presidential election from Donald Trump.  (*See, e.g.*, *Smartmatic v. Lindell,* No. 22-cv-0098, Am. Compl. at ¶¶ 71-143 (D. Minn. 2022).)  But no reasonable person would contend that Donald Trump could have won Los Angeles County in the 2020 general election, nor that he could have won California's electoral college votes.  In fact, Trump received a higher percentage of Los Angeles County's votes in 2020 (although still a low percentage) than he did when running against Hillary Clinton in 2016.  (*Compare* Secretary of State Shirley N. Weber, Supplement to Statement of Vote for Nov. 3, 2020, General Election at 3, *available at:* https://elections.cdn.sos.ca.gov/sov/2020-general/ssov/complete-ssov.pdf, *to* Secretary of State Alex Padilla, Statement of

16

Vote for Nov. 8, 2016, General Election at 17, *available*

*at:* https://elections.cdn.sos.ca.gov/sov/2016-general/sov/2016-complete-

sov.pdf.)  But even if Trump had received ***every single one*** of the 4.2 million votes

cast for president in the County in November 2020, he ***still*** would have lost

California, where Joe Biden's winning margin was more than 5 million

votes.  (*See* Weber, *supra*, at 3, 5.)  A Republican candidate has not carried the State

of California in a U.S. presidential election since 1988.  (Presidential Voting History

of California, AMERICAN PRESIDENTS SINCE 1960, *available at:*

https://www.americanpresidents.net/states/california.php.)

Instead of claiming that Smartmatic stole California votes from Trump, the

defendants claimed that votes were stolen in other states, using equipment from

Smartmatic's competitors Dominion Voting Systems Corporation and Election

Systems & Software, in which the outcome of the 2020 presidential election was

closer.  (*See, e.g.*, Am. Compl. ¶¶ 150–56.)  Defendants claimed, for example,

"ESS, Smartmatic and Dominion, you can interchange the names, they all are the

same[]" and "these machines where it got hacked, Dominion, Smartmatic, Hart all

of them are the same, ES&S. You just say Dominion, but it's all

machines."  (*Id.* ¶¶ 151m, 151o (emphasis omitted).)  But besides being absurd on

its face, the assertion that Dominion and ES&S somehow used "the same"

technology as their competitor Smartmatic to steal votes from Donald Trump in

other parts of the country has nothing to do with Los Angeles County.  It is beyond

dispute that Los Angeles County did not use a Dominion or ES&S voting system.

On the contrary, the County's VSAP system is of its own design, and the County

owns intellectual property rights in it.  Smartmatic did not get involved with VSAP

until the County contracted with it to manufacture the machines to its specifications

and provide other support services.  That was the result of a bidding process that

took place after the basic design had already been created at the County's direction

and under its control.  (*See* Owens Decl. ¶¶ 4–6; Bhullar Decl. ¶¶ 4-8.)

Even if there were some relevant issue about the election *in Los Angeles County*, the security and accuracy of that election could be confirmed without resort to source code, hundreds of thousands of communications, or highly sensitive security protocols.  In accordance with California law, the California Secretary of State mandated rigorous testing of the County's VSAP technology before it could be certified for use in the 2020 Election.  Independent testers performed extensive tests on the VSAP system, including security testing that included a full source code review and penetration testing.  (*See* Bhullar Decl. ¶¶ 15-25.)  Results of the testing are publicly available.  (*See* California Secretary of State, Los Angeles County VSAP Certification Information, *available at:*
https://www.sos.ca.gov/elections/ovsta/voting-technology-vendors/los-angeles-county-vsap.)

After VSAP was demonstrated to be secure, the independent testing authority oversaw the creation the "trusted build" of the VSAP software and created an immutable hash value that uniquely identified that code.  (*See* Bhullar Decl. ¶¶ 20-23.)  The County then placed the trusted build files, along with the software source code, into a state-approved escrow facility.  Smartmatic had no access to the trusted build files during this process.  (*Id.* ¶ 24.)  What is more, as an additional security mechanism, the VSAP voting system uses encryption to ensure that each component of the VSAP system is conforming to security standards and the data being passed to components is secure and authenticated.  VSAP uses a pair of encryption keys that allow the voting system hardware to confirm that the software loaded onto the hardware is the verified trusted build file.  If the software loaded onto the hardware is not identical to the trusted build file, the loading will halt, a notification will be displayed, and the machine will not be usable.  The County is in sole possession of the encryption keys, and Smartmatic never has access to them.  (*Id.* ¶ 23.)

There is nothing about Smartmatic's claims of damage to its business prospects that could make the requested documents relevant, let alone justify the

sweeping breath and tremendous burden of the defendants' requests. The discovery requests at issue are not reasonably directed, nor pertinent, to any damage issue. No prospective future customer of Smartmatic would have had access to confidential documents belonging to the County of Los Angeles, nor to the information that such documents contain, nor would purchasing decisions plausibly be determined by the details within such documents. If the defendants really need information about how Smartmatic's work for the County might have influenced prospective customers, the defendants should serve discovery requests tailored to that distinct and narrow issue.

## VI. LINDELL AND MY PILLOW'S DOCUMENT DEMAND IS ABSURDLY OVERBROAD.

It is inappropriate and indeed abusive for Lindell and My Pillow to demand "all communications between Los Angeles County and Smartmatic." (*See supra* part II E.) By requesting all communications regardless of their content, timing, or subject matter, they have ignored Rule 45's requirement that parties "avoid imposing undue burden or expense on a person subject to the subpoena." FED. R. CIV. P. 45(d)(1); *see also Struck v. Yida* GAO, No. 2:22-cv-02415-SPG-MAA; 2:23-mc-00028-SPG-MAA; 2:23-mc-00029-SPG-MAA; 2:23-mc-00030-SPG-MAA, 2023 U.S. Dist. LEXIS 111857, at *46–48 (C.D. Cal. Mar 15, 2023) ("This request seeks all documents and information related to Gao, regardless of the subject matter of such communication. This is overly broad on its face as it does not limit the scope of information[.]"); *Pinn v. Consumer Credit Counseling Found., Inc.*, MC 22-00240-DSF (AGRx), 2023 U.S. Dist. LEXIS 115365, at *3–4 (C.D. Cal. Jan. 19, 2023) ("Request No. 4 calls for all communications with the FCC regarding robocalls. This request is overbroad on its face, without any time period, and does not appear to have relevance to the issue of Plaintiff's consent."); *Hosseinzadeh v. Bellevue Park Homeowners Ass'n*, No. C18, 2020 U.S. Dist. LEXIS 106222, at *6–8 (W.D. Wash. June 17, 2020) (declining motion to compel subpoena that sought all communications).

Lindell and My Pillow have access to extensive public documentation on VSAP and have received some one million documents from Smartmatic in discovery.  (*See supra* part II I; O'Brien Decl. ¶ 7.)  If they genuinely need any additional documents, they should get them from Smartmatic, against which a motion to compel such production is already pending.  (*See* O'Brien Decl. ¶ 7.)[1]

## VII.  LINDELL AND MY PILLOW ARE NOT EQUIPPED TO USE—OR TO PROTECT— THE HARDWARE, SOFTWARE, AND DOCUMENTS THEY ARE SEEKING.

Lindell and My Pillow's counsel are withdrawing and, by their own admission, they lack the funds to review the "millions of documents" already produced, provide document hosting, and carry out expert disclosures and discovery.  (*See supra* part II G.)  Under these circumstances, Lindell and My Pillow are unable to effectively analyze source code, BMDs, or hundreds of thousands of more documents—production of which would impose a pointless burden on the County.  Further, their lack of stable representation and lack of a reputable expert witness increase the danger that sensitive information will be

---

[1] The Court should not feel obligated to try to tailor Lindell and My Pillow's overbroad subpoenas, as courts are reluctant to modify subpoenas when that would result in rewriting them for one party's benefit. *See National Staffing Sols, Inc. v. Sanchez*, No. 6:21-cv-1590-PGB-LHO, 2022 U.S. Dist. LEXIS 240895, at *19 n.1 (M.D. Fla. Sept. 12, 2022) ("[M]any of these subpoena requests are so broad as to encompass any and all documents, and . . . the Court would be scouring through the record in the hopes of reading National's mind and engaging in a complete rewrite of the subpoena. The Court will not do National's job for it."); *Hosseinzadeh*, 2020 U.S. Dist. LEXIS at *8 (declining to modify overly broad subpoenas); *Simplex Mfg. Co. v. Chien*, No. C12-0835-RAJ, 2012 U.S. Dist. LEXIS 124625, at *7 (W.D. Wash. Aug. 31, 2012) (same).  In addition, the court in Minnesota is best positioned to address any details of appropriate scope.

leaked or misused—especially since Lindell has apparently inappropriately disclosed election software in the past.  (*See supra* part II F.)

## VIII.  THE PROTECTIVE ORDER DOES NOT PROVIDE ADEQUATE PROTECTION.

It is no answer to say that the parties have stipulated to a confidentiality order in this case.  Even when there is a protective order, courts have blocked disclosure of confidential and proprietary source code when it could cause irreparable harm and the moving party has failed to establish that it needs to review the information. *See Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 260 (S.D.N.Y. 2008) (noting that the parties' stipulated confidentiality order was "careful and extensive, but nevertheless not as safe as nondisclosure"); *Congoo LLC v. Revcontent*, No. 16-401 (MAS), 2017 U.S. Dist. LEXIS 130731, at *9 (D.N.J. Aug. 10, 2017) ("Assuming . . . that the source code is relevant, the Court finds that its highly confidential nature is such that it cannot be adequately safeguarded by a Discovery Confidentiality Order . . . .").  Indeed, the California Secretary of State—the certifying authority for Los Angeles County elections—has detailed why the protective order in this case is not sufficient to protect election security.  (*See* Owens Decl., Ex. E, Mot. ¶ 14 at p. 7 ("While there is a protective order in place in the underlying lawsuit, it does not adequately protect the Secretary's interests.").)

## IX.  LINDELL AND MY PILLOW ARE NOT ENTITLED TO CLAIM ATTORNEYS' FEES.

Lindell and My Pillow's request for fees and costs is improper.  They acknowledge that the County timely objected to their subpoenas. (*See* Mot. at ¶¶ 7, 19.)  If the target of a subpoena timely objects, a court may not issue sanctions under Rule 45 unless the court first issues an order requiring compliance and the subpoenaed party defies that court order, resulting in a finding of contempt.  *See, e.g., Penwalt Corp. v. Durand-Wayland, Inc.,* 708 F.2d 492, 494 n.5 (9th Cir. 1983) ("a subpoena duces tecum is itself a court order, and noncompliance may warrant contempt sanctions," but, when the subpoena recipient objects in writing,

21

"the party seeking discovery must obtain a court order directing compliance" before contempt will be available); *Poturich v. Allstate Ins. Co.,* No. EDCV 15-0081-GW (KKx), 2015 U.S. Dist. LEXIS 187149, at * 6-7 (C.D. Cal. Aug. 11, 2015) ("Here, there was no Court order compelling discovery in place, and it is thus premature to find Quality Sheds in contempt at this juncture."); *In re Denture Cream Prods. Liab. Litig.,* 292 F.R.D. 120, 128–29 (D.D.C. 2013) ("Here, there was no Court order compelling discovery in place, and it is thus inappropriate to find the Sarfez Entities in contempt at this juncture."); *In re Plise,* 506 B.R. 870, 879 (B.A.P. 9th Cir. 2014) ("[I]n cases of nonparty subpoenas under Civil Rule 45, the court must first issue an order compelling the nonparty's compliance with the subpoena, and the nonparty must fail to comply with the order before any contempt sanctions can be awarded.").

## X.   CONCLUSION

The Court should not allow Lindell and My Pillow's unbridled pursuit of a nonsensical and unsupported conspiracy theory to undermine election security, threaten the County's ability to conduct the 2024 election, or burden it with producing hundreds of thousands of documents.  Lindell and My Pillow's motion should be denied in its entirely.  If for any reason, the Court does order any production, it should be narrowly circumscribed and subject to strict protections.

Dated:  October 6, 2023          **ONE LLP**


                                 By: */s/ William J. O'Brien*
                                     William J. O'Brien

                                 *Attorneys for Non-Party Objector*
                                 *The County of Los Angeles*

**MEMORANDUM IN OPP. TO MOT. TO ENFORCE SUBPOENAS**

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for non-party objector The County of Los Angeles, certifies that this brief contains 6,790 words, which complies with the word limit of L.R. 11-6.1.

Dated:  October 6, 2023                    By: */s/ Willliam J. O'Brien*
                                               William J. O'Brien

---

23

**MEMORANDUM IN OPP. TO MOT. TO ENFORCE SUBPOENAS**